The 4th District Appellate Court of the State of Illinois has reconvened. The Honorable Robert J. Stegman providing. Thank you, Mr. Bailiff. This next case on our call is 423-0126, People of the State of Illinois v. Christopher Jensen. For the appellant is Jessica Wynne Arizzo. You are she, ma'am? Yes. And for the appellee is Jamie Lynn Bella. Is that pronounced correctly? Yes, Your Honor. You are she. Okay, Ms. Arizzo, you may make your argument on behalf of the appellant. Thank you. May it please the Court, again, Jessica Arizzo, Office of the State Appellate Defender, on behalf of Christopher Jensen. There are two issues before this Court today, one regarding the jury receiving incorrect written jury instructions, and the second involving the ineffective assistance of trial counsel. Regarding the jury instruction issue, a substantial defect in jury instructions is reversible error. Here, the common law record is carefully organized and divided. It's a long record, about 650 pages, and it's divided into sections regarding the instructions. There's a section for jury instructions given, one for people's instructions, one for withdrawn or refused, and one for defendant's instructions. The jury instructions given section contains numerous pages of instructions that are all clean copies of the instructions. There's no notation on there. This is what you would expect the jury to have received. However, although the jury was instructed orally by the judge correctly, this packet of jury instructions, written jury instructions given to the jury, are missing at least six crucial instructions, including the definition and issues instruction for home invasion, the instruction instructing the jury when force may be used in self-defense, as well as when they may consider the defendant's priors against him. But those instructions were read to the jury? Yes, all of the correct, the correct, the jury, the oral instructions were correct, yes. So how do you account for the difference between what was read to the jury and what the common law record shows? Well, the record, the reported proceedings shows that there was a lot of confusion in the court about the different instructions. The judge at one point says, I'm going to rule on this later. He moves it to a different pile, and then he can't find it later. He talks about how he has two versions of the same people's instruction, and then he can't, he doesn't have a clean version. He said he lost track of the numbers of the instructions. The instructions, when they were given orally, he had to improvise because there was a mistake in the written that had to be reprinted by the state because there were mistakes in the wording. But then those reprinted documents were also wrong. So he was saying he had, the state said that the clean copies were right, the dirty copies were wrong, and there was a lot of confusion. So it isn't as though the judge read these instructions page after page, and these were handed to the bailiff and then gave them to the jury. There was a lot going on here that suggests that there was some mix-up with these instructions, and that's why the incorrect ones went to the jury. Also, in addition to the ones I mentioned, there was one instruction that was given that was not missing, but it was incorrectly written. So this was a very important instruction, 6.07x, regarding attempt first degree to murder, and the third proposition, whether or not the defendant was justified in use of force. Now, there's no clean copy of that instruction with that third proposition anywhere in the common law record. So if the jury received it, then where is it? All we have in the record is it's in defendant's instructions because it was the defendant's ultimately reading to the jury. But the fact that there's no clean copy of that instruction with the third proposition anywhere suggests that the jury did not receive it. Counsel, I'm sorry, I want to make sure I heard you correctly. That it was the defendant's instruction, do you mean that in the plural or just with regard to this instruction that were then read to the jury? I was just referencing, it was the defendant's version of 6.07x. So it was their version that had this crucial third proposition regarding self-defense. I just want to make sure that your comment was limited to that, not beyond. While I'm making an inquiry, do you challenge in any way the accuracy of the report of the proceedings itself? No. Thank you. Go ahead. Pardon me? You may proceed. Go ahead. Oh, yes. So the other point I wanted to make regarding this, the oral versus the written, and whether or not the state suggests that the fact that the oral instructions were correct is enough to make this not an issue. The problem here is we have a case that's very complex in terms of the instructions. There were dozens and dozens of instructions, lots of parts, even the verdict forms went on for page and page of the oral instructions. And when the state's attorney was giving their closing argument, they actually said to the jury, I'm going to mention a few of the instructions, the judge is going to talk about the instructions, but don't feel like you have to copy these down. You're going to get these written copies. So it's very likely that the jury heard this, trying to digest all of these oral instructions given to them by the court. But it's thinking in the back of their head, we're going to have these written instructions to look at. I don't need to write it down. I don't have to memorize it. I just need to kind of listen to what's going on. And then we'll get these correct written instructions when we deliberate. But that didn't happen here. One other point I wanted to mention about this issue was that in their brief, the state suggested that the proper remedy here would be a 329 hearing. It's the defense position that the for this court to rule on this issue without having to remand the case. Again, it's already been remanded once for a crankle. This case is now over a decade old. It would likely be a waste of judicial resources even to go back and try to have this hearing where it's unclear what the memories of the participants would even be at this time. And again, we do believe the record here sufficiently that based on the way that the common law record is divided and organized that the jury received the improper written instructions. If there are no more questions on that issue, I'll move on to my second issue. There were several factors here, the actions done by defense to counsel that amounted to ineffective assistance of counsel. When a court addresses a motion in limine prior to trial as was done here, it's always up for reconsideration. It can always be revisited. It's not set in stone. Yet despite the fact that when the motions in limine regarding the 911 call and the potential lynch material were discussed and ruled on prior to trial, the defense had not yet put forth their affirmative defense of self-defense. And when the defense pivoted to that, defense counsel should have revisited these as a result of this defense. Counselor, to all of your arguments beyond the arguments concerning instructions where you're arguing ineffective assistance or a plain error, isn't an issue in all of these cases that there's prejudice to the client, to your client as a result of the lack of professionalism shown by the defense attorney? Right, yes, that the defendant was prejudiced by counsel's actions. And given the overwhelming evidence of his guilt in this case, why do we need to address anything other than the absence of prejudice on this record to your client? Well, there was a lot of evidence presented by the state to put Jensen in the house at the time of the shooting. The evidence regarding self-defense, regarding what actually happened inside the house between these two gentlemen, that evidence was close. That was not overwhelming. All we have is Mr. Alfredson's testimony and we have Mr. Jensen's testimony, whether this was self-defense, who shot first, what exactly happened. So all of the other evidence that you're referencing, Your Honor, such as the video footage and the DNA and testimony from witnesses about the fact that the defendant went to this house on that day, that all is not an issue because the defendant admitted a trial. Yes, I was there. Yes, I went to talk to him. But what happened was self-defense. So it's not as though it's just an issue of the evidence to prove that he was there. He's saying he was there. What about his statements to the police that he didn't know who this guy was and had never been there? Right. Yes, the defendant did make statements that were contradictory to his testimony. And obviously, I don't, I mean, we can't understand why he did that at the time, but it's very possible that when this happened, the defendant had gone there to talk about an illegal activity, buying drugs from this man. Perhaps he wanted to exclude himself from the situation completely. Maybe he didn't know whether what happened was self-defense. I mean, it's not the kind of thing that people would understand the intricacies of the law and know, yeah, I was there, but it was self-defense when here I know he knows that he went there to talk about, you know, how the guy was mad at him about drug sales and owing him money. And the whole thing is kind of messy. It's not it's not a clear cut self-defense case. So maybe he just wanted to distance himself as much as he possibly could. OK, I wasn't even there. And then when he recognized, OK, I need to own up. I was there. But, you know, this is what happened. And I don't think that I'm and I think I was justified in my actions. Counselor, I may discuss just briefly that the lynch serial, if you will. The defense argued self-defense and basically the defendant's testimony was Alfredson was angry, pointed a gun at him, demanded money, you know, forcing them to wrestle for the gun. And moments later, you know, Alfredson supposedly threatens him, points a gun at him and then in response, you know, defendant then then fire. So in essence, we we have this kind of fight, if you will, over a drug transaction. How would it be given this particular version of events, if you will, surrounding the shooting with the defendant's knowledge about the victim's violent tendencies towards his his ex-wife really be relevant to who would have been the aggressor in that situation? Right. So it's our argument that the his all of the knowledge that that Mr. Jensen had regarding Mr. Alfredson's past, the fact that he had abused his wife and, you know, she left him and she had crutches and she was, you know, she was severely injured. This is all going to be something sort of that's informing all every decision he makes, whether or not he consciously is aware that he is thinking about this, you know, as the actions are happening. I mean, it's it's a split second decision. It's not as though he's thinking, oh, right, this guy is violent. I know that he hurt his wife. Therefore, he's shoot he's going to shoot me again. I need to fire back. It's not as though that's the kind of thought process someone would have in this situation. But based on the general opinion and the knowledge and awareness of what he has about Mr. Alfredson's past, what kind of a guy he is, that he has a lot of guns, that he is a violent person. This is all going to create the perception in Mr. Alfredson that he is in danger. So even going to the house this, you know, before this all took place, this is all information that he has in his head, you know, that that this man is that this man is dangerous. And also going back to the strength of the state's evidence against your client. Yes. How do you account for the letter that the defendant gave to Mr. Hare, I believe was his name, which was a letter to be given to Ms. Williams, which contains what can only be described as extensive information talking about how he's guilty of this crime and don't help the state. You're the only witness against me, etc. What do you make of that? Right. Well, again, this goes back to similar to my prior answer is that this is this is evidence to show that he was trying to hide the fact that he was there. He didn't want his girlfriend to testify that she had dropped him off nearby. He wanted to pretend that he hadn't gone there. But then again, later, he decided he needed to own up to it, admit he was there and try to explain what happened. So he did make many poor decisions regarding what he told the police, this letter to his girlfriend, trying to get her not to testify or not to talk to police or not to answer the subpoena. But that doesn't none of that changes what happened in in that house when he went there and there was a confrontation, even if it happened exact. I'm sorry. Why doesn't this show consciousness of guilt so as to be a strong factor to consider when evaluating the overall strength of the state's case? Well, he he certainly was feeling guilty about the fact that he was at that house and that he there to confront him about calling him about the drugs money that he owed. And it shows yes, it shows that he was involved in the incident. Again, it doesn't show that he was he felt guilty about what actually happened or that what he testified to was not true. If we conclude that the evidence of his guilt is overwhelming, we don't need to concern ourselves with your other arguments, do we? If you if you if you determine that the evidence, well, you would. I mean, you'd have to make a determination that the lynch material on the 911 call was there's no way that that there was no prejudice. Right. There was no there was no overwhelming. Right. Again, I don't that that's correct. If you if you determined that the the prejudice prong of the Strickland analysis, you know, would not be met. But again, I would have to reiterate that the evidence regarding self-defense regarding what actually happened between the two men in the house is not overwhelming. We do not have overwhelming evidence that he shot first or that it wasn't self-defense. We just have a lot of evidence to put him in that out. Just to specifically discuss very briefly, the the 911 call itself, defense counsel, when he told the court he had no objection to the admission of the 911 call, he had not listened to it. He didn't listen to it until sometime later prior to trial. And it was seven and a half minutes long. And although the they stated the state stated the purported purpose was to show Alfred's in a state of mind and body that all could have been accomplished. Well, it was accomplished with his testimony. He testified to the same things that were in this recording. And the the facts that they mentioned that were relevant from this recording took place in the first 30 seconds or so. And what followed was a lot of very moving, sad, emotional language from him, thinking he was dying, asking for help, kind of fading out of consciousness, the 911 operator having to say his name, making sure he's still there. None of this was, this was more far more prejudicial than it was probative to the issue of guilt in this case. And the the state's attorney mentioned it during their closing argument, bringing it up again, all we know that he said he was dying. And when he you heard the call, he said he was dying, you know, emphasizing this sort of emotionally charged phone call that really was highly prejudicial to the defendant. And the reason why the Defense Council testified at the motion for new trial that he wanted this in was because he thought that it would show that Alfredson was lying because it was he said it was two young Mexican kids. But by the time we're at trial, the defense is self defense. So we're, you know, defendant is already saying he's he was there. So any sort of relevance that might have had would have would be out the window at that point, because he's admitting to being in the house. And similarly, the the Lynch issue is, you know, at the time it was decided prior to trial, you know, the state even mentioned this is not you know, there's no self defense issue here. This is none of this is going to be relevant. But the judge said, you know, if it becomes relevant, if some door is opened, we can revisit it. And the Oh, I'm sorry, I see that I'm out of time. opportunity to address this again. Okay, okay. Thank you. Miss Bella, you may argue on behalf of the people. Thank you, Your Honor. My name is Jamie Bella on behalf of the people of the state of Illinois. As counsel pointed out, there's two issues before this court. I wanted to address unless there's any objection, I would like to address the second issue, the ineffective assistance of counsel first, solely because I believe that I'm able to shed some light on the jury instruction issue. And I just want to make sure there isn't time for that, because that could be a remand issue for a 329 hearing. Go ahead. So turning to the ineffective assistance as a counsel, I agree with your honor that the that a determination that the overwhelming evidence in this case would render any ineffective assistance of counsel non prejudicial can dispense with this issue. I, I agree fully that the the evidence against the defendant, both of the incident itself with the DNA evidence with the hat, his his actions later, which show the continuing to lie to his attorney up until the point where his his own sister had come forward to give a statement about the claims that he had made to her before she went to the police. So as all of those things come together at trial, those those factors are going to be very significant when it comes to determining the level of prejudice that could be run that could be, you know, present based on any of an effective assistance to counsel. Specifically, the I do want to address also, in the very beginning part of the defense reply brief, they raise an objection to the state's reliance on facts that were not presented to the jury. And I just wanted to point out that under the ineffective assistance of counsel analysis per Strickland, you you're not limited to considering facts only that were presented to the jury. And in fact, at the time that this issue first became before the court in the state's motion in limine, there was no trial. And again, when counsel presented the notice of the affirmative defense, that also was prior to trial. So the Strickland analysis considers the decision making, you know, behavior of the attorney at the moment that it happened, it ignores the hindsight factor, it tries to consider counsel's decisions at the moment, and in the circumstances surrounding him at the time that they were made. So the 911 call, as counsel noted, and I agree that the the way that this defense evolved was very much affected by the defendant's own behavior with his interaction with his, not just the facts against him, but his, what appears to be idea that from jail, he could control the amount of evidence that was going to be available to the state by interfering with witnesses. You know, things like that. It wasn't until his sister came forward that he kind of abandoned that plan and then had his attorney now accept the fact that he was at the house, but then his defense became, the victim and I are well acquainted. At that moment, counsel could have abandoned the idea that the video itself, or I'm sorry, the recording, the 911 recording itself, helps the defendant because he wasn't able to identify him by name. But at that moment, the probative value of that information amplified tremendously because it directly in the crosshairs of being an issue in this trial. Because while the phone call itself, in the first 25 seconds, he may not be able to identify his attacker at that moment. But as this man is clearly of the belief that his death is intimate, most humans would be able to identify that in that moment, a person who knew their attacker would identify them to the person on the other end of that call. So I think that by the affirmative defense in this case actually increased the probative value of that so that counsel, even if he had objected at that point, I think that there was a very low likelihood that he would have been successful in preventing that for being added into evidence. As far as the lynch material, I understand counsel's argument that the defendant's awareness of any background information related to the victim as it relates to his tendency to be violent may factor in. But that portion, there's two different steps in the lynch analysis. And under the first prong, which relates to the facts that formed the defendant's unreasonable belief that that fatal force was necessary or appropriate in that circumstance, the question in that circumstance has less to do with whether anything that a person knows about a victim becomes relevant anytime they've slapped someone or raised their voice. That's not the is whether the violent nature can be used to support the defendant's behavior that a normal person would see as innocent would not be innocent in this specific instance. But that's not the case here because in this specific instance, the defendant is claiming that the victim shot at him. I don't think that there's any argument at all that that behavior could be considered innocent and that you need the other evidence to support the idea that it would be normal for a person to see this as innocent behavior. But because this victim has a violent background, the fact that he shot at me, it's the fact that he shot at him that you don't need any other, that if it's true, would make the defense more prominent. But in this case, there's no other reason to admit that lynch material because he's not saying he stood up off the couch really fast, so I thought he was going to shoot at me. He's saying he actually shot at me. So the idea that you need to develop the idea that this person's capable of violence dissipates with that defense. I couldn't make out an argument that it was relevant under the second prong, and I think in the reply brief, the defense kind of clarifies that that is the case, that they're relying on the first arm of the lynch analysis. So this state would rest on its arguments in the brief as it relates to the remainder of that argument. Thank you, counsel. Ms. Arizo, do you have any rebuttalment? I think Ms. Bella was not finished. Oh, I'm sorry, Ms. Bella. I apologize. I thought you had finished, and please forgive me. You may continue. That's okay. If there's no more questions on the ineffectiveness of the counsel, I'd like to address the jury instruction issue. I would agree that the record in this case, the common law record, the documents that are in there don't line up with what you would expect to see based on the conversation that was had during there's actually four different instances in the report of proceedings where the conversation about court was having the initial jury instruction conference, and then later after the three instructions, after the court had orally instructed the jury, they had another conversation about the three instructions that they found that were incorrect. It was kind of a painstaking process, but what I decided to do to try to shed some light on this situation was print every single jury instruction and the report of proceedings related to both of those portions where they're discussing it and walk through each step that was occurring as it was happening in the ROP and what I believe happened. I think that if the court does not agree with me, then Rule 329 would be the appropriate mechanism because the way that the common law is situated would suggest that there's a common or a local kind of custom for the way that their record is compiled. Of course, questions about whether and under what circumstances errors could be made would be best answered by the clerk and we don't even know who specifically bunches these documents together. I'm assuming the clerk, but again, I would have to make an assumption to do that and I'm not sure that that's appropriate under the Rule 329. However, going back to the jury instructions, my belief after going through every single instruction and every single word that was said about the instructions during the proceedings is that the page that marks the common law record as jury instructions given is not the documents in that section are the clean copies that match with the documents that the state, at the beginning of the jury instruction conference, the prosecutor gave the court clean and dirty copies of every single instruction that were given by the state for jury instructions. As they discussed them, they were moving the documents around. When you take each instruction that's in the given section and you compare it word for word to the document that is given by the state, you'll see, for example, I won't go through every single one. Just the spreadsheet I put together to keep track of this is 27 pages. I think going through each and every one would be too painstaking and I wouldn't have time. The first one that I can give as an example is the IPI number 1.02. In the instruction conference, there's a three, people's was accepted and people's 3A was withdrawn. If you look at the given, the jury instructions given section on page, this is C301 in the record, is identical to the people's 3A that is located at common law 256. Those two are identical. If you look at instruction number three, which is located at common law 230, there is no identical instruction in the jury instructions given section. As you go through the entire process, if you get to people's number seven, that was withdrawn. The withdrawn instruction for that appears both in the withdrawn category of documents, which is located at common law 349. The identical instruction is located in the given, which is common law 302. As you go down and you compare each one, and I know in the defendant's reply, they argue that this case is different than the cases Durr and Himerson that were cited by the misstatement of law in a particular instruction. In this case, I think the fact that there are so many that it really tends to lean toward the idea that the clean copies that are in the record were not the ones that were given to the jury. At the very end of that section, there's a bunch of verdict forms. Those verdict forms tell the tale. Again, the clerk at the Winnebago court would be able to better explain how those things are compiled. When the jury got done deliberating and they came back into the courtroom, the court announced them. In the record, it says that the court collected from the jury the verdict forms. Then they spent some time going through the verdict forms and then read the verdict. The jury left, came back, and only the verdict forms were handed back to the court. It doesn't say in there what happened to the ones that were given. Now, at the jury instruction conference, all of the ones that were withdrawn would have been retained. The stack that was actually given to the jury would have gone with the jury, and at the end of deliberations, the ones that were returned to the court on the record are only the signed verdict forms. The only instructions that are in the given section that I could find was people's 20, which was a statute. There's a 20 and a 20A. This one was actually entered. It was given twice, three different forms. That particular instruction shows up in the given file, in the state's instructions file, and in the withdrawn file. Under the given, it is common law 311 through 312. Then it's in there a second time, identically as 320 to 321. The people's section is located at 263 and 264. That same instruction shows up again in the withdrawn section, which is 357 to 358. I think the magnitude of the disparity between the instructions that were orally given to the jury and what's included in this given file, if the only document in this whole record that suggests that the jury got the wrong written instructions is that single piece of paper that precedes the section that says, jury instructions given. The rest of the documents, one by one, compared to the record, what was said about them, and the prosecution's suggested forms at the very beginning, suggest that those are not the documents that were given to the jury at all. Absent that single piece of paper, which I've only ever seen that in a case in Rockford. The other cases that I have in the third, fourth, and fifth districts, I don't see anything like that. Under this, whatever circumstances surround compiling the record in that way is something that if the court is convinced that those documents, that there's a potential, I disagree that there's a potential that those are the documents. It would shock me to think that the jury would have been able to reach a verdict at all based on just what's included in that file. I think the defense agrees with me. I think that we just disagree about what that means. I think that the jury would have had to ask questions, would have had to bring this issue to somebody's attention, given that nothing that they were instructed orally lined up with what was given to them, if that was in fact what they were given. I think the more obvious situation is that the wrong, that the paper that says jury instructions given was most likely meant to say jury instruction clean copies because or rejected clean copies because none of them might match with any of the given instructions. There's a couple in the verdict forms, but by and large, it's hard to find a document in the section that is identical in form to one of the ones that were accepted during the actual discussion. But again, I think that it would be unfortunate after a decade to ask the court to address the local procedure that results in that particular way of compiling the record. But I think that if this court is convinced that those are the documents that were given to the remand for a 329 is the way to resolve it. And unless your honors have any questions, specific, specific questions, I will rest on any of the arguments that I have in my brief. Thank you, counsel. Now, Mr. Rezo, I think it's time for you to give us your argument. Okay, yes, thank you. Um, I, I did not make a spreadsheet comparing the different instructions, the way that counsel did. And I understand that must have been a quite quite an undertaking, but I did go through and compare oral versus written based on the packet of ones that were in the section of given and I and I disagree that nothing matched up. I have the you know, was on page 307 was also read. I mean, I won't go through this all but I disagree that they don't match at all that nothing that was orally given was also in this packet. And I mean, I the suggestion that these documents that are in the common law record, but after the page that says instructions given are not the instructions given really concerns me because where would those instructions have gone? A jury is not going to deliberate on you know, with these instructions, and then what they're just gonna let them toss them out. That's a that does not seem like that any any county is going to have the procedure where the instructions that are actually given to the jurors are discarded, but they save the people's clean copies of what wasn't given. I mean, that just that to me that doesn't follow sort of what about the Supreme Court's decision people versus door where they seem to have addressed the situation and said, it's not to the credit of the local circuit court that they messed up with these instructions. But there's no indication that the jury was not given the proper instructions based on the record, right? That's, I'm sorry, go ahead. Doesn't that cover the situation? It doesn't. And this is why in that case, we're talking about one instruction that had that they had to not the jury was not supposed to get but had a notation on given. There was no indication anywhere that it was actually given to the jury. The jury was not a clean copy that was in the common law record that said instructions given this was someone had written handwritten given and obviously that was the case. Pardon me. In fact, in that case, the transcript of proceedings did not show that that instruction was read to the jury. Isn't that correct? Correct. Yes. In this case, we have a transcript that shows the jury was read the proper instructions. Why is it that the beginning and end of our inquiry? Well, again, as I said earlier, the amount of instructions, the fact that jury was told they receive these written instructions to rely on during their deliberations. The fact that, you know, it was a long amount of time that he was reading these instructions to the jury. But you know, they the the fact that the the oral was correct is not enough. It's not like some of the cases where, you know, you you you give more credence to the to the reporter proceedings. For example, the the judge says MSR for this defendant, it's two years, but then the sentencing order says three. And the reviewing court will say, well, we're going to look at and go by what the report of proceedings says. That's not what happens here. We have the judge on the report of proceedings giving this information orally. And then some documents were given to the jurors. We don't know that it was the same documents. These are two separate things that happens here. And so that's why it's it's different. It's not enough to just say that they received the instructions orally because what they were given written was contradictory. Very quickly before I'm out of time regarding the the Lynch issue, the fact that Mr. Alverson did not tell the police that he recognized his assailant or the man who had shot him. It does not show that it's not it does not prove that that makes that make the call more relevant for any particular reason. There's plenty of reasons why he would deny the fact that he knew this guy when it was related to drug dealing. He lied to the police and Alverson lied to the police that he was involved in drugs. So he was obviously wanting to distance himself from seven and a half. Yes. How many? Seven and a half. So we have this guy. It sounds like a dying declaration for me and still the dying declaration. My gosh, he's still maintaining. He doesn't know who shot him. Doesn't recognize these people. Is that to defeat the argument months later that was going to be made that it was self-defense? I see I'm out of time, but to respond to your question, it could just be a matter that he he just did not want himself to be implicated, whatever, whatever. So in have any kind of guilt in the interaction at all. He's been usual case of lying during his dying declaration. It's it's it's possible that he was lying. It's just to sort of distance himself from the criminality of the situation. OK, well, thank you, counsel, where you will take this matter of advisement, be in recess and appreciate your arguments.